# EXHIBIT ONE

Electronically Filed
4/8/2021 4:48 PM
Steven D. Grierson
CLERK OF THE COURT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Christina V. Miller, Esq.
Nevada Bar No. 12448
Lindsay D. Robbins, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 637-2345; Fax: (702) 946-1345
lrobbins@wrightlegal.net
*Attorneys for Plaintiff, Bank of America, N. A., as Successor by Merger to BAC Home Loans Servicing, LP*

CASE NO: A-21-832600-C
Department 15

**EIGHTH JUDICIAL DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP,<br><br>   Plaintiff,<br><br>  vs.<br><br>NORTH AMERICAN TITLE INSURANCE COMPANY, DOE INDIVIDUALS I through X; and ROE CORPORATIONS XI through XX, inclusive<br><br>   Defendants. | Case No.:<br>Dept. No.:<br><br>**COMPLAINT**<br><br>**ARBITRATION EXEMPT: DAMAGES EXCEED $50,000** |

Plaintiff Bank of America, N.A., as Successor by Merger to BAC Home Loans Servicing, LP ("BANA"), by and through its attorneys of record, Darren T. Brenner, Esq., Christina V. Miller, Esq., and Lindsay D. Robbins, Esq. of the law firm of Wright, Finlay & Zak, LLP, submits its Complaint against North American Title Insurance Company ("NATIC"), Doe Individuals I through X ("Does"), and Roe Corporations XI through XX, inclusive ("Roes") (collectively, "Defendants") for breach of its obligations to defend and indemnify BANA under a title insurance policy issued to insure a deeds of trust on real property located in Nevada.

/ / /

*Parties, Jurisdiction and Venue*

1.      Plaintiff BANA is a national banking association as that term is defined in the National Bank Act. BANA has its main office and principal place of business in Charlotte, North Carolina.

2.      Defendant NATIC is a California corporation with its principal place of business in Florida and doing business in Clark County, Nevada.

3.      BANA does not know the true names, capacities or bases of liability of fictitious defendants sued as Does I through X and Roe Corporations XI through XX, inclusive (collectively "fictitious Defendants"). Each fictitiously named defendant is in some way liable to BANA. BANA will amend this Complaint to reflect the true names of said defendants when the same have been ascertained.

4.   This matter is exempt from Arbitration as BANA has incurred in excess of $50,000 as a result of NATIC's conduct.

5.      This Court has personal jurisdiction over NATIC because it has engaged in the business of issuing and underwriting title insurance policies insuring deeds of trust on land located in the State of Nevada and therefore have sufficient contacts with the State to have availed themselves of the State's jurisdiction.

6.      Venue is appropriate in this Court because this judicial district is where a substantial part of the events giving rise to BANA's claims took place, and it is the location of the property subject to the insured deed of trust that is at the core of this lawsuit.

*Nature of Title Insurance*

7.      A title insurance policy is a contract through which the insurer is paid one sum in consideration for agreeing to indemnify the insured up to a specified amount against loss caused by encumbrances upon or defects in the title to real property in which the insured has an interest.

8.      Lenders often seek to obtain title insurance policies in connection with loans they advance that are secured by interests in real property. The title insurance policy generally

protects the lender against risks associated with loss of title or practical use of the property, subject to the policy's terms, exclusions, and conditions.

9.       As title insurance underwriters, NATIC authorized certain entities and individuals in Nevada to issue title insurance policies on their behalf.

10.       This lawsuit concerns the issuance of a title insurance policy by NATIC.

11.       The large majority of insurance policies issued by NATIC's issuing agents use standard forms promulgated by the American Land Title Association ("ALTA") and the California Land Title Association ("CLTA").

12.       ALTA and CLTA are trade groups made up of representatives from the major title insurance underwriters and issuers, including NATIC.

13.       These standard ALTA and CLTA forms are used by multiple title insurers, which publish guides concerning the coverage (and exceptions thereto) provided by the standard policy. The standard ALTA policy form has been revised from time to time, including changes in 1992, 2006, and 2012.

14.       There are a number of ALTA standardized endorsement forms that can be issued with the standard policy to modify the scope of coverage available. NATIC has also used CLTA standardized endorsement forms from time to time.

15.       ALTA also has promulgated a "short-form" policy. The short-form policy contains references to the common standardized endorsement forms and other provisions typically included as part of a "full" policy.  Thus, a title insurance issuer can use ALTA's short-form policy to issue a policy to a lender that incorporates by reference the standard forms referenced in the full policy as those forms existed on the date the policy is issued.

16.       Lenders commonly request that title insurers include ALTA Endorsement Form 9 ("Form 9"), or its CLTA equivalent, CLTA Endorsement Form 100 ("Form 100"). These "comprehensive" endorsements provide a range of guarantees to the insured relating to the existence of covenants, conditions, or restrictions affecting or governing the property which could cause damage to the insured lender's interest at the time the policy is issued or in the future.

17.    It is commonly understood between title insurers and their insureds that Form 9/Form 100 "[p]rovides comprehensive coverage for [an] insured ALTA lender against loss by reason of present *or future* [covenants, conditions and restrictions] violations[.]"[1]

18.    Lenders often also request that title insurers issue ALTA Endorsement Form 5 ("Form 5"), or its CLTA equivalent, CLTA Endorsement Form 115.2 ("Form 115.2").[2] ALTA Form 5 / CLTA Form 115.2 endorsements "[p]rovide[] coverage for an insured ALTA lender against loss concerning violations of CC&Rs [and/or] homeowners association charges and assessments."[3]

### *NATIC Issued Policies Understood to Cover Nevada Superpriority Liens*

19.    In 1982, the Uniform Law Commission promulgated the Uniform Common Interest Ownership Act ("UCIOA"). UCIOA provided a number of standardized terms governing the formation of common interest associations, including condominium associations and homeowners associations.

20.    As relevant here, UCIOA provided that homeowners associations' covenants, conditions, and restrictions included a "superpriority" lien for unpaid assessments, which came into existence when the association was formed (i.e., when its declaration of covenants, conditions, and restrictions were recorded), and would take priority over a subsequently recorded mortgage or deed of trust even if no assessments were due at the time the mortgage or deed of trust was recorded.

21.    In 1991, the Nevada Legislature adopted the 1982 version of UCIOA, codifying it in Chapter 116 of the Nevada Revised Statutes.

22.    Chapter 116 includes NRS 116.3116, which, at the time of the events relevant to this suit, stated in relevant part:

---

[1] A true and correct copy of non-party Fidelity National Title Group, Inc.'s ("Fidelity") Endorsement Guide is attached as **Exhibit 1** (emphasis added).
[2] ALTA made minor changes to Form 9 in 2006, designating the amended forms as "Form 9-06" and "Form 5-06." Those changes are not material to the issues presented here, and the Complaint will refer to Form 5 and Form 5-06 and Form 9 and Form 9-06 interchangeably.
[3] *Id.*

1.  The association has a lien on a unit for any construction penalty that is imposed against the unit's owner pursuant to NRS 116.310305, any assessment levied against that unit or any fines imposed against the unit's owner from the time the construction penalty, assessment or fine becomes due. . . .

2.  A lien under this section is prior to all other liens and encumbrances on a unit except:

. . .

(b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent . . . ;

. . .

The lien is also prior to all security interests described in paragraph (b) to the extent of any charges incurred by the association on a unit pursuant to NRS 116.310312 and to the extent of the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien . . . .

. . .

4. Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.

23.    Under NRS 116.3116, from the time an association's covenants, conditions, and restrictions are recorded, the properties governed by the association are encumbered by a lien that secures all assessments. Chapter 116 does not require that an association record a separate lien before the lien is foreclosed.

24.    As part of its adoption of UCIOA, the Nevada Legislature also enacted NRS 116.1104:

Except as expressly provided in this chapter, [NRS 116's] provisions may not be varied by agreement, and rights conferred by it may not be waived. Except as otherwise provided in paragraph (b) of subsection 2 of NRS 116.12075, a declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of this chapter or the declaration.

25.    The Nevada Legislature also enacted NRS 116.1206(1):

> Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.

26.    NATIC and other title insurers were aware of Nevada's adoption of NRS Chapter 116, including its provision of a "superpriority" lien in a homeowners association's covenants, conditions, and restrictions.

27.    On information and belief, between 1991 and the present, NATIC has published underwriting manuals containing language indicating that Paragraphs 1(a) and 2(a) of Form 9 provides coverage for losses due to "provision[s] [in recorded covenants, conditions and restrictions] permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust."

28.    On information and belief, from 1991 until the present NATIC has provided endorsement manuals for their issuing agents explaining the scope of coverage provided by Form 9 and Form 5.

29.    On information and belief, NATIC's endorsement manuals informed their issuing agents that Form 9 and Form 5 would provide coverage to an insured that suffered loss or damage due to an association's lien for assessments that became delinquent after the date of policy

30.    NATIC has authored and produced secret "Confidential" documents in other similar cases that, if produced here, would demonstrate its knowledge and belief that coverage was afforded to Bank of America under the policy at issue in this case. *See Bayview Loan Servicing v. North American Title Insurance Company*, 2:19-cv-01151.

31.    NATIC believed it was liable for an insured's losses caused by the enforcement of an association's superpriority lien if the policy at issue contained in Form 9 or Form 5.

32.    Contemporary trade usage describing the terms and scope of Form 9 and Form 5 indicates that those endorsements provide coverage for an insured lender in the event that covenants, conditions, and restrictions of record at the date of the policy allow an association's

lien to take priority over the insured mortgage or deed of trust. *See, e.g.*, Barlow Burke, LAW OF TITLE INSURANCE § 10.05[B] (3d ed., 2002 Supp.) (in describing Form 9: "A second type of endorsement of interest to an insured lender is one covering the loss of lien priority because of the enforcement of a private covenant applicable to the title. … The priority of these covenants, restrictions, and conditions is particularly important to mortgage lenders with loan policies because their supporting documents, also recorded, typically include the power to compel the payment of amounts for the maintenance and repair of the common facilities in a large subdivision. Often the exercise of these maintenance and repair functions is put in the hands of a subdivision homeowner's association. It also typically holds a lien to compel the payment of these amounts, and that lien also has priority over later recorded mortgage."); *id.* ("Future violations [of covenants, conditions, and restrictions] are also insured against, but only to the extent that the violations occur between the policy date and the acquisition of title in any foreclosure action, provided the violation causes the insured to be insecure or results in loss or damage to the title acquired by the insured in satisfaction of the secured debt, as where the insured takes a deed in lieu of foreclosure." (citing ALTA Form 9 ¶¶ 1(a), 2)).

33.    NATIC represented to the public and to BANA's predecessor-in-interest that Form 9 and Form 5 provided coverage against losses caused by an association's superpriority lien.

34.    Despite having actual knowledge of the possibility that BANA could lose its security interest in properties that were governed by homeowners associations, at no time did NATIC inform BANA or its predecessors-in-interest of the danger of losing its security interests in such properties.

### *The Nevada Supreme Court Interprets NRS 116.3116*

35.    In *SFR Investments Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev. 742, 334 P.3d 408 (Nev. 2014), the Nevada Supreme Court confirmed that a portion of the lien included in a Nevada homeowners association's covenants, conditions, and restrictions has superpriority over a recorded first deed of trust.

36.    The Court further held that NRS 116.1104 rendered inoperative clauses in associations' covenants, conditions, and restrictions that purported to allow senior deeds of trust to survive an association's foreclosure of the superpriority lien provided in its covenants, conditions, and restrictions.

37.    *SFR Investments* confirmed that the proper foreclosure of an association's superpriority lien extinguishes a recorded senior deed of trust on the same property.

38.    Following *SFR Investments*, non-party Stewart Title Guaranty Company issued a bulletin to its agents in Nevada indicating that "in lieu of issuing a[] [Form 9] for a lender's policy," its agents should "issue the ALTA 9.10."[4] Additionally, the issuing agents were also instructed that "in lieu of issuing an ALTA 5 for a lender's policy" to issue the ALTA 5.1 instead."[5]

39.    Upon information and belief, NATIC and its affiliates have issued similar bulletins to its issuing agents as a result of the decision in *SFR Investments*, indicating their belief that Form 9 and Form 5 provided coverage for losses caused by superpriority liens.

40.    In *K&P Homes v. Christiana Trust*, 133 Nev. 364, 398 P.3d 292 (Nev. 2017), the Nevada Supreme Court held that *SFR Investments* "did not create new law or overrule existing precedent; rather, that decision declared what NRS 116.3116 has required since the statute's inception" in 1991.

41.    Under controlling Nevada law, the covenants, conditions, and restrictions at issue here have provided the association with a lien that could attain priority over a senior deed of trust since 1991.

### *Facts Specific to this Case*

**Claim for 7424 Calzado Drive, Policy # 45002-08-11804-02, Claim # 2015-45002-011**

42.    On October 28, 2008, NATIC issued a title insurance policy numbered 45002-08-11804-02 (the "McCurdy Policy")[6] in favor of Universal American Mortgage Company, LLC, its successors and/or assigns, insuring the validity of a deed of trust (the "McCurdy Deed

---

[4] A true and correct copy of Stewart Title Bulletin NV2014002 is attached as **Exhibit 2**.
[5] *Id.*
[6] A true and correct copy of the McCurdy Policy is attached as **Exhibit 3**.

of Trust") securing a mortgage loan with property located at 7424 Calzado Drive, Las Vegas, Nevada 89178 (the "McCurdy Property").

43.    By issuing the McCurdy Policy, NATIC entered into a contractual relationship with Universal American Mortgage Company, LLC and its successors and assigns to insure that the McCurdy Deed of Trust was superior to competing liens, including a homeowner association's lien.

44.    The McCurdy Policy is written on a standard ALTA 2006 short-form loan policy form and incorporates by reference standard ALTA Endorsements on Form 5-06 and Form 9-06.

45.    The McCurdy Property is subject to the Declaration of Covenants, Conditions, and Restrictions ("Tuscalante CC&Rs") for the Tuscalante Homeowners Association ("Tuscalante"), which were recorded as of the day the McCurdy Policy was issued.

46.    Pursuant to the Tuscalante CC&Rs and NRS 116.3116, as of the date the McCurdy Policy was issued, Tuscalante had a superpriority lien against the McCurdy Property for any assessments that became due.

47.    At the time it issued the McCurdy Policy, NATIC was aware of the Tuscalante CC&Rs, Tuscalante's lien for unpaid assessments, and the fact that the lien could take priority over the McCurdy Deed of Trust.

48.    At the time it issued the McCurdy Policy, NATIC was aware that Universal American Mortgage Company, LLC and its successors and assigns were relying on the industry's general understanding of the coverage afforded by standard Form 5-06 and Form 9-06 endorsements to protect against the risk of an association's superpriority lien.

49.    On or about April 26, 2013, Tuscalante foreclosed on its assessment lien against the McCurdy Property and purported to convey title to SNJ Enterprises, Inc. ("SNJ") at the foreclosure sale.

50.    SNJ later conveyed its title to the McCurdy Property to Premier One Holdings, Inc. ("Premier One") via a quitclaim deed dated May 21, 2013.

51.     Premier One has asserted the position that it acquired title to the McCurdy Property free and clear of the McCurdy Deed of Trust as a result of the Tuscalante foreclosure.

52.     At all relevant times, BANA, as successor by merger to BAC Home Loans Servicing, LP, has been the beneficiary of the McCurdy Deed of Trust.

53.     BANA is an insured under the McCurdy Policy.

54.     On or about February 9, 2015, BANA's counsel submitted a claim to NATIC for coverage under the McCurdy Policy.

55.     Tiffany Ramirez, Senior Claims Counsel for NATIC, sent BANA's counsel a letter indicating that NATIC was denying BANA's claim under the McCurdy Policy in full.

56.     In her letter, Ms. Ramirez stated that NATIC was denying the claim under the McCurdy Policy based on the contention that the enforcement of Tuscalante's lien had been "created, suffered, assumed or agreed to" by BANA, and because BANA's claim was purportedly untimely, causing prejudice to NATIC.

57.     Neither BANA nor any of its predecessors in interest regarding the McCurdy Deed of Trust created, suffered, assumed, or agreed to the creation or enforcement of the Tuscalante superpriority lien.

58.     NATIC did not suffer any prejudice from the timing of BANA's submission of the title claim for the McCurdy Policy, as NATIC routinely and consistently denied claims submitted before a homeowner association's foreclosure on its superpriority lien.

59.     BANA has suffered losses or damages as a result of the priority of the lien for charges and assessments at Date of Policy in favor of Tuscalante, as provided for in Schedule B of the McCurdy Policy.

60.     BANA has suffered losses or damages as a result of the existence of the Tuscalante CC&Rs, under which the McCurdy Deed of Trust could be "cut off, subordinated, or otherwise impaired," as well as losses or damages from "future" (i.e., post-Date of Policy) violations on the land of the Tuscalante CC&Rs, which occurred prior to BANA's acquisition of title to the McCurdy Property and resulted in the alleged invalidity, loss of priority, or unenforceability of the lien of the McCurdy Deed of Trust.

### FIRST CAUSE OF ACTION
#### Declaratory Judgment

61.     The allegations in Paragraphs 1 through 60 above are expressly incorporated by reference.

62.     This Court has the power and authority to declare BANA and NATIC's rights and legal relations in connection with the McCurdy Policy.

63.     An actual controversy has arisen between BANA, on the one hand, and NATIC, on the other, as to whether the McCurdy Policy provides coverage to BANA for losses caused by Tuscalante's foreclosure on its purportedly senior lien.

64.     The McCurdy Policy incorporates by reference an endorsement Form 9-06, which states that NATIC insured BANA:

> against loss or damage which Lender shall sustain by reason of any of the following matters:
>
> 1.     The existence of any of the following:
>
> a.     Covenants, conditions, or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;
>
> …
>
> 2(a).     Any future violation on the land of any covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest referred to in Schedule A by the insured, provided the violation results in: the invalidity, loss of priority, or unenforceability of the lien of the mortgage referred to in Schedule A, or result in impairment of loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;

65.     As to the McCurdy Deed of Trust, the Tuscalante CC&Rs and NRS 116.3116 gave Tuscalante a superpriority lien as of the date of issuance of the McCurdy Policy.

66.     The foreclosure of the superpriority portion of Tuscalante's lien imposed by the Tuscalante CC&Rs would "cut off" and "impair[]" the Deed of Trust.

67.     Thus, as of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [McCurdy Deed of Trust] c[ould] be cut off, subordinated, or otherwise impaired[.]"

68.    After the Date of Policy, the borrower for the mortgage loan secured by the McCurdy Deed of Trust violated his covenant on the land to pay HOA assessments to Tuscalante.

69.    The borrower's post-policy violation of his payment covenant thus constituted a "future violation[] on the land of [the HOA's] covenants, conditions or restrictions," which occurred "prior to the acquisition of title to the" McCurdy Property by BANA.

70.    The borrower's delinquent assessments were secured by the continuing lien provided by the Tuscalante CC&Rs.

71.    The foreclosure of that lien purportedly "result[ed] in impairment and loss" of the McCurdy Deed of Trust.

72.    For these reasons, under Paragraphs 1(a) and 2(a) of Form 9-06, the McCurdy Policy provides coverage for all losses and damages sustained by BANA as a result of Tuscalante's foreclosure sale.

73.    Additionally, the McCurdy Policy includes an endorsement on Form 5-06, which states that NATIC insured BANA:

against loss or damage sustained by reason of:

. . .

2.    The priority of any lien for charges and assessments at Date of Policy in favor of any association of homeowners which are provided for in any document referred to in Schedule B over the lien of any insured mortgage identified in Schedule A.

74.    The Tuscalante CC&Rs are a document identified in Schedule B of the McCurdy Policy.

75.    BANA has suffered "loss or damage" due to the "priority" of Tuscalante's "lien for charges and assessments," as that lien existed on the date the McCurdy Policy was issued.

76.    For these reasons, under Paragraph 2 of Form 5-06, the McCurdy Policy provides coverage for all losses and damages sustained by BANA as a result of Tuscalante's foreclosure sale.

77.     BANA has complied with its material contractual obligations under the McCurdy Policy.

78.     When the McCurdy Policy was issued, it was the intent of BANA's predecessor-in-interest and NATIC that Form 9-06 and Form 5-06 would provide coverage for losses or damages sustained as a result of the superpriority lien created by the Tuscalante CC&Rs.

79.     Contemporary trade usage describing the terms and scope of Form 9-06 and Form 5-06 indicates the endorsement provides coverage for an insured lender for losses and damages sustained as a result of covenants, conditions, and restrictions.

80.     BANA is entitled to a declaration that the McCurdy Policy provides coverage for all losses or damages sustained by BANA as a result of Tuscalante's foreclosure sales.

81.     BANA is entitled to a declaration that NATIC breached the McCurdy Policy by refusing to indemnify BANA and by refusing to provide for a defense or curative title action, thus forcing BANA to engage in litigation at its own expense.

82.     BANA was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### SECOND CAUSE OF ACTION
**Breach of Contract**

83.     The allegations in Paragraphs 1 through 82 above are expressly incorporated by reference.

84.     BANA is the insured under the McCurdy Policy.

85.     As described above, NATIC issued the McCurdy Policy to BANA's predecessor-in-interest, providing coverage for any loss or damage sustained by BANA as a result of covenants, conditions, or restrictions under which the Deed of Trust could "be cut off, subordinated, or otherwise impaired," or "any future violations on the land of any covenants, conditions, or restrictions" which result in the impairment or loss of the Deed of Trust.

86.     The McCurdy Policy issued by NATIC, also provides coverage for any loss or damage sustained by reason of the priority of Tuscalante's assessment lien provided by the Tuscalante CC&Rs over the lien of the McCurdy Deed of Trust.

87.     The McCurdy Policy gave rise to defend BANA in any litigation arising from a challenge to the validity or priority of the McCurdy Deed of Trust and to either cure the defects on title or indemnify BANA for any losses it sustained as a result of the loss of priority or extinguishment of the McCurdy Deed of Trust.

88.     BANA has complied with its material contractual obligations under the McCurdy Policy.

89.     BANA has suffered an insured loss or damages under the McCurdy Policy.

90.     NATIC breached the McCurdy Policy by refusing to indemnify BANA for its covered losses, and refusing to attempt to cure the covered title defect.

91.     These breaches of the McCurdy Policy have proximately resulted in general and special damages to BANA, including attorneys' fees and litigation expenses, which BANA has incurred and will continue to incur.

92.     As a result of these breaches of the McCurdy Policy, BANA was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### THIRD CAUSE OF ACTION
#### Bad Faith / Breach of the Covenant of Good Faith and Fair Dealing

93.     The allegations in Paragraphs 1 through 92 above are expressly incorporated by reference.

94.     NATIC had a duty to act in good faith and in a manner consistent with fair dealing in its considerations of BANA's claim under the McCurdy Policy, including a duty of candor and to avoid denials of the claim without reasonable basis.

95.     On information and belief, NATIC knew or had reason to know that BANA's predecessor acquired the McCurdy Policy with the expectation that such coverage would be provided.

96.     On information and belief, NATIC knew or had reason to know that BANA acquired its interest in the McCurdy Deed of Trust and became the Insured under the McCurdy Policy with the expectation that such coverage would be provided.

97.     NATIC knew that, had BANA submitted a claim under the McCurdy Policy before Tuscalante completed its foreclosure, NATIC would have denied the claim and would have refused to take any action to prevent the foreclosure.

98.     NATIC knew that BANA had not "created, suffered, assumed, or agreed to" the existence or enforcement of the superpriority portion of Tuscalante's lien, as those terms are defined the in the McCurdy Policy.

99.     NATIC acted with malice, fraud, and/or oppression by denying the claim under the McCurdy Policy based on Exclusion 3(a) when it knew that BANA had not "created, suffered, assumed, or agreed to" the existence or enforcement of the superpriority portion of Tuscalante's lien.

100.    NATIC acted with malice, fraud, and/or oppression by denying the claims under the McCurdy Policy based on supposed prejudice when it knew that it would have denied any claim submitted before Tuscalante's foreclosure sale as "premature."

101.    NATIC intentionally breached its duties and acted in bad faith by denying BANA's claims for coverage under the McCurdy Policy.

102.    BANA has suffered damages as a result of NATIC's bad faith and breach of its duty of good faith and fair dealing.

103.    As a result of NATIC's bad faith, BANA was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Violation of NRS 686A.310**

104.    The allegations in Paragraphs 1 through 103 above are expressly incorporated by reference.

105.    NATIC prepared and circulated memoranda, bulletins, underwriting guides, and other communications indicating that Form 9 and Form 5 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

106.    NATIC knew that public descriptions of Form 9 and Form 5 indicated that coverage would be available if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

107.    NATIC represented to BANA, its predecessor in interest, and its agents that Form 9 and Form 5 provided coverage in the event that the McCurdy Deed of Trust lost priority or was otherwise impaired by operation of the Tuscalante CC&Rs.

108.    By misrepresenting that it had suffered prejudiced due to the timing of BANA's claims under the McCurdy Policy when, in fact, NATIC would have denied any claim submitted before the association's foreclosure sale as "premature," NATIC breached Nev. Rev. Stat. § 686A.310(1)(a).

109.    By misrepresenting that no coverage was available under the McCurdy Policy because BANA had "created, suffered, assumed, or agreed to" the enforcement of the Tuscalante assessment lien despite knowing that BANA had not created, suffered, assumed, or agreed to the creation or enforcement of the lien, NATIC breached Nev. Rev. Stat. § 686A.310(1)(a).

110.    NATIC's liability under the McCurdy Policy for the potential extinguishment of the McCurdy Deed of Trust was "reasonably clear," as shown by NATIC's internal memoranda, bulletins, underwriting guides, and other communications.

111.    By failing "to effectuate [a] prompt, fair, and equitable settlement[]" of BANA's claims under the McCurdy Policy, NATIC violated Nev. Rev. Stat. § 686A.310(1)(e).

112.    By compelling BANA "to institute litigation to recover amounts due under" the McCurdy, NATIC violated Nev. Rev. Stat. § 686A.310(1)(f).

113.    In light of NATIC's external statements and internal documents and representations that Form 9 and Form 5 provided coverage if an insured lien was impaired or otherwise affected by the enforcement of an association's superpriority lien, NATIC's violations of Nev. Rev. Stat. § 686A.310 arising for its denial of coverage under the McCurdy Policy for that exact scenario have been oppressive, willful, and malicious.

1    114.    As a result of NATIC's unfair practices, BANA was required to retain counsel to

2    prosecute this action and is entitled to recover its corresponding attorneys' fees.

3    ## PRAYER FOR RELIEF

4    WHEREFORE, premises considered, BANA requests that this Court grant judgment in

5    its favor and against the NATIC, and award BANA:

6    A.    a declaration establishing that the McCurdy Policy provides coverage for all

7    losses or damages sustained by BANA as a result of the Tuscalante foreclosure sale;

8    B.    compensatory damages;

9    C.    punitive damages;

10    D.    attorneys' fees;

11    E.    costs; and

12    F.    other relief deemed to be just.

13    DATED this 8th day of April, 2021.

14    WRIGHT, FINLAY & ZAK, LLP

15    */s/ Lindsay D. Robbins*
16    Darren T. Brenner, Esq.
      Nevada Bar No. 8386
17    Lindsay D. Robbins, Esq.
      Nevada Bar No. 13474
18    7785 W. Sahara Ave., Suite 200
19    Las Vegas, NV 89117
      *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1



# Endorsements

## Common Endorsements requested by Residential Lenders

FORM DESCRIPTION
CLTA

*Generally, endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions from Coverage, or excepted from coverage either by the pre-printed exceptions, if any, or by the specific exceptions shown in Schedule B of the policy.*

*Because of this, most endorsements are not general in nature, but are specific as to items for which the insured desires coverage. Some are specifically designed for owner's policies and others for lender's policies.*

*The issuance of any endorsement is conditioned upon the circumstances surrounding the property involved, and upon the fulfillment of the underwriting criteria established by the Company.*

*The following descriptions do not define the coverage of the endorsement, which can only be determined by reading the same. This list is provided as a convenience in locating the endorsement which may fit a particular set of facts. CLTA Endorsement (with ALTA Equivalent) Numbers Available*

**100** Provides comprehensive coverage for insured ALTA lender against loss by reason of present or future CC&Rs violations, the encroachment of improvements, or by reason of surface entry for mineral development.

Endorsement provides insurance that:

1. There are no CC&Rs under which the lien of the insured mortgage can be cut off, subordinated or impaired;

2. There are no present CC&R violations on the land; and

3. Except as shown in Schedule B, there are no encroachments of improvements on the land onto adjoining land, and no encroachments of improvements on adjoining land onto the land. Endorsement insures against loss by reason of:

I . Future violations of CC&Rs which result in loss of the insured mortgage lien or title to the land if the insured lender has acquired same by foreclosure or conveyance in lieu thereof;

2. Unmarketability of title by reason of CC&R violations occurring prior to acquisition of title by the insured lender;

3. Damage to improvements which encroach on any portion of the land subject to an easement excepted in Schedule B;

4. Damage to improvements resulting from the exercise of any right to use the surface of the land

for the extraction or development of excepted minerals; and

5. Final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

**100.12** Provides insured lender with insurance concerning the enforceability of reverter rights found in CC&Rs.

**100.13** Provides insured ALTA lender with insurance concerning the priority of a mortgage lien over maintenance or upkeep assessment liens.

**100.18** Provides insured lender with coverage against loss by reason of the exercise or attempted exercise of reverter rights in CC&Rs.

**100.23** Provides insured ALTA lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals leased under oil lease.

**100.24** Provides insured ALTA lender with insurance that lessee under mineral lease does not have any right to enter on or use the surface of the land.

# FIDELITY NATIONAL TITLE

Template Copyright © 2009 EffectiveSolutions,LLC for HelpMyTitleRep.com members only

# Endorsements

100.26 Provides insured ALTA lender with coverage against loss by reason of damage to proposed or completed improvements under FHA project, resulting from the exercise of surface or subsurface rights for the extraction or development of minerals excepted from the description of the land.

100.29 Provides insured owner or lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals excepted from the description of the land or shown as a reservation in Schedule B.

101.2 Provides insured construction lender with coverage against loss by reason of a lack of priority of the insured mortgage over statutory liens for services, labor or material arising out of a work of improvement referred to in a recorded notice of completion.

102.4 Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land and that their location docs not violate referenced CC&Rs.

102.5 Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land, that their location does not violate referenced CC&Rs and that they do not encroach upon referenced easements. (Broader coverage than Form 102.4).

103.1 Provides insured lender with coverage against loss by reason of the exercise of the right of use or maintenance of a particular easement by the easement holder.

103.1a Provides insured lender with against loss resulting from (1) damage to the existing improvements, including lawns, shrubbery and trees, on the land, and (2) interference with the continuing use, as presently utilized, of the existing improvements on the land, arising from a particular easement described in Schedule B.

103.3 Provides insured lender with coverage against loss by reason of the forced removal of improvements which encroach upon a particular easement which easement right is presently being exercised

103.4 Provides insured owner or lender with insurance that an insured easement affords ingress and egress to and from a specified public street.

103.7 Provides insured owner or lender with assurance that the land described in Schedule A abuts upon a specific, physically- open public street.

104.1 Provides assignee of the insured mortgage with assurance concerning (a) validity of a recorded assignment to evidence transfer of the entire beneficial interest to the named assured assignee and (b) full or partial reconveyances, modification or subordination of the insured mortgage.

108.7 Provides insured CLTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance.

108.8 Provides insured ALTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance

110.5 Provides insured ALTA lender insurance concerning proper modification of the insured mortgage, including express priority coverage.

110.9 (ALTA form 8.1) Provides insured ALTA residential lender with coverage against loss by reason of lack of priority over (a) any federal or state environmental protection lien which is recorded in the public records, except as set forth in Schedule B, and (b) any state environmental protection lien provided for by any state statute in effect at Date of Policy, except as provided for by state statutes specified in the endorsement.

111.5 (ALTA Form 6) Provides insured ALTA variable rate mortgage lender with coverage against loss by reason of (1) invalidity or unenforceability of the insured mortgage resulting from terms therein providing for changes in the rate of interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest.

111.8 (ALTA Form 6.2) Provides insured ALTA variable rate mortgage lender with coverage against changes in the rate of interest, the addition of unpaid interest to principal and/or interest on interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest, unpaid interest added to principal and/or interest on interest.

111.9 Provides insured ALTA lender with insurance concerning the priority of a mortgage lien relating to FNMA Balloon mortgage, conditional right to refinance, extension of the loan term and change in the interest rate.

111.10 (Optional Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in

# Endorsements

accordance with the terms of a specified loan agreement. Except as to intervening matters of which the insured has actual knowledge.

111.11 (Obligatory Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in accordance with the terms of a specified loan agreement.

115    Provides insured lender with insurance that the estate or interest covered by the policy is a condominium, in fee, and is entitled to be assessed and taxed as a separate parcel.

115.1    Provides coverage for an insured ALTA lender against loss concerning statutory compliance. Violations of CC&Rs, homeowners association charges and assessments, the separate assessment of real property taxes , encroachments and the exercise of a right of first refusal to purchase, all with respect to a condominium unit within a condominium project.

115.2    Provides coverage for an insured ALTA lender against loss concerning violations of CC&Rs, homeowners association charges and assessments, encroachments and the exercise of a right of first refusal to purchase, all with respect to a parcel of land in a planned development.

116    Provides insured ALTA lender with insurance concerning the street address of designated improvements on the land; and, with respect to the sufficiency of the policy plat to show the record location and dimensions of that land.

116.1    Provides insured lender with insurance that the land described in the policy is the same as that delineated on plat of a survey

attached to and made a part of the policy.

116.2    Provides insured ALTA lender with insurance concerning the street address of designated separately-owned elements comprising pan of the insured condominium and with respect to the sufficiency of the referenced map or plan to show the exterior boundary of the condominium project as a whole.

116.7    Provides insured with insurance that the land described is a lawfully created parcel according to the California Subdivision Map Act and local ordinances adopted pursuant thereto.

122    Provides insured ALTA lender with insurance concerning obligatory advance made under the insured mortgage; liability limited to face amount of policy.

123.1    (ALTA form 3) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land and the broad, allowable use or uses under that classification.

123.2    (ALTA Form 3.I) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land, the allowable use or uses under that classification and with respect to the existing structure on the land, limited coverage concerning compliance with applicable provisions of the zoning ordinance.

124.1    Provides insured owner or lender with insurance concerning affirmative and/or negative covenants contained in a deed or agreement between landowners.

124.2    Provides insured owner or lender with insurance concerning affirmative covenants contained in a lease.

124.3    Provides insured owner or lender with insurance concerning negative covenants contained in a

lease.

125    Provides coverage for the insured ALTA lender against loss by reason of a judicial determination that (a) the insured mortgage lien (or the lender's title after foreclosure) has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth in Lending Act, and that (b) such right of rescission existed because neither the loan transaction nor the right of rescission there of was exempted or excepted by the provision of Regulation Z.

126.1    Provides coverage for insured CLTA owner of a one-to-four family residence against defined loss by reason of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

126.2    Provides coverage for insured CLTA fee owner of a residential condominium against defined loss concerning the separate assessment of taxes, lack of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

# EXHIBIT 2

# EXHIBIT 2

# Bulletin : NV2014002

**Date:** November 06, 2014

**To:** All Nevada Issuing Offices

**RE:** RATES AND/OR FORMS UPDATE - Use of the ALTA 9.10, the ALTA 4.1, and the ALTA 5.1

_____

Dear Associates:

Due to the recent decision by the Nevada Supreme Court in the case of SFR Investments Pool 1 LLC vs. US Bank, questions have arisen regarding the issuance of loan policies and endorsements to lenders making loans secured by condominiums, planned unit developments, or other common interest developments with a homeowners association. At this time, the only changes to our underwriting procedures are that 1) in lieu of issuing an ALTA 9 (or a CLTA 100) for a lender's policy, issue the ALTA 9.10; 2) in lieu of issuing an ALTA 4 for a lender's policy, issue the ALTA 4.1, and; 3) in lieu of issuing an ALTA 5 for a lender's policy, issue the ALTA 5.1.

If you have any questions relating to this or other bulletins, please contact a Stewart Title Guaranty Company underwriter.

For on-line viewing of this and other bulletins, please log onto www.vuwriter.com.

# References

**Bulletins Replaced :** None

**Related Bulletins :** None

**Underwriting Manual :** None

**Exceptions Manual :** None

**Forms :** None

# EXHIBIT 3

# EXHIBIT 3

186481923

Form No. 6056.06
ALTA  Loan Policy (6-17-06)

Print Date/Time: 11/05/08 / 01:12-PM

45002-08-11804-02

# LOAN POLICY OF TITLE INSURANCE

## ISSUED BY:

## NORTH AMERICAN TITLE INSURANCE COMPANY

Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, NORTH AMERICAN TITLE INSURANCE COMPANY, a California corporation (the "Company"), insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.
7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage
   (a) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
   (b) failure of any person or Entity to have authorized a transfer or conveyance;
   (c) the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
   (d) failure to perform those acts necessary to create a document by electronic means authorized by law;
   (e) a document executed under a falsified, expired, or otherwise invalid power of attorney;
   (f) a document not properly filed, recorded, or indexed in the Public Records including failu...
   (g) a de...

**001007256    MCCURDY-LU NA**

10. The lac...
    lien or...
11. The lac...
    (a) as s...
       inst...
       fron...

**610   186481923   D1   001   001**

   improvement or work is either
      (i) contracted for or commenced on or before Date of Policy; or
      (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and
   (b) over the lien or any assessments for street improvements under construction or completed at Date of Policy.
12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named insured assignee free and clear of all liens.
13. The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title
   (a) resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction creating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
   (b) because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of failure of its recording in the Public Records
      (i) to be timely, or
      (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.
14. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by the policy, but only to the extent provided in the Conditions.

North American Title Insurance Company

Attest:  _John T. MacMillan_          By:  _Emilio Fernandez_


NORTH AMERICAN TITLE INSURANCE COMPANY
INCORPORATED
SEPT 18, 1958
CALIFORNIA

John T. MacMillan, Secretary          Emilio Fernandez, President

SNATIITP4527 Rev. 06/26/07

**SCHEDULE A**

# North American Title Insurance Company

File Number: 45002-08-11804            Policy Number:  45002-08-11804-02
Loan No.:    0008937153

Address Reference:   7424 Calzado Drive
                    Las Vegas, NV 89178

Amount of Insurance: $ 273,972.00        Date of Policy: October 28, 2008 at 12:29 PM
Premium:       $ 386.75

1.   Name of Insured:

     Universal American Mortgage Company, LLC, its successors and/or assigns

2.   The estate or interest in the Land that is encumbered by the Insured Mortgage is:

     Fee and Easement

3.   Title is vested in:

     Nicholas A. McCurdy-Luksch and Michelle McCurdy-Luksch, Husband and Wife as Joint tenants.

4.   The Insured Mortgage and its assignments thereof, if any, are described as follows:

     Deed of Trust dated 10/06/08 from Nicholas A. McCurdy-Luksch and Michelle McCurdy-Luksch, Husband and Wife, as Trustor to Stewart Title Company, as Trustee to Mortgage Electronic Registration Systems, Inc. as Beneficiary, in the original principal amount of $273,972.00 recorded 10/28/08 in Book 20081028 as Document No. 4300 of Official Records.

5.   The Land referred to in this policy is described as follows:

     LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A"  AND MADE A PART HEREOF.

6.   This policy incorporates by reference those ALTA endorsements selected below:

| | | |
|---|---|---|
| ☐ | 4-06 | (Condominium) |
| ☐ | 4.1-06 | |
| ☒ | 5-06 | (Planned Unit Development) |
| ☐ | 5.1-06 | |
| ☐ | 6-06 | (Variable Rate) |
| ☐ | 6.2-06 | (Variable Rate-Negative Amortization) |
| ☒ | 8.1-06 | (Environmental Protection Lien) Paragraph b refers to the following state statute(s): |
| ☒ | 9-06 | (Restrictions, Encroachments, Minerals) |
| ☐ | 13.1-06 | (Leasehold Loan) |
| ☐ | 14-06 | (Future Advance-Priority) |
| ☐ | 14.1-06 | (Future Advance-Knowledge) |
| ☐ | 14.3-06 | (Future Advance-Reverse Mortgage) |
| ☒ | 22-06 | (Location)  The type of improvement is a Single Family Residence, and the street address is as shown above. |

ALTA Loan Policy
Schedule.A (6/17/06)

Order Number:    45002-08-11804
Policy Number:   45002-08-11804-02
Loan Ref.:       0008937153

## EXHIBIT "A"

PARCEL ONE (1):

LOT 249 OF FINAL MAP OF MOUNTAINS EDGE POD 211 (A COMMON INTEREST COMMUNITY) AS SHOWN BY MAP THEREOF ON FILE IN BOOK 131 OF PLATS, PAGE 17 AND AMENDED BY THAT CERTAIN CERTIFICATE OF AMENDMENT RECORDED MAY 19, 2008 IN BOOK 20080519 AS DOCUMENT NO. 3223, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

RESERVING THEREFROM A NON-EXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ENJOYMENT IN AND TO THE COMMON ELEMENTS AS DELINEATED ON SAID MAP REFERRED TO ABOVE AND FURTHER DESCRIBED IN THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR TUSCALANTE, RECORDED NOVEMBER 22, 2006 IN BOOK 20061122 AS DOCUMENT NO. 748 OF OFFICIAL RECORDS.

PARCEL TWO (2):

A NON-EXCLUSIVE EASEMENT FOR INGRESS, EGRESS AND ENJOYMENT IN AND TO THE COMMON ELEMENTS AS DELINEATED ON SAID MAP REFERRED TO ABOVE AND FURTHER DESCRIBED IN THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR TUSCALANTE, RECORDED NOVEMBER 22, 2006 IN BOOK 20061122 AS DOCUMENT NO. 748 OF OFFICIAL RECORDS.

North American Title Insurance Company

**Order Number:** 45002-08-11804
**Policy Number:** 45002-08-11804-02
**Loan Ref.:** 0008937153

### SCHEDULE B-PART I

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, nor against costs, attorneys' fees or expenses, any or all of which arise by reason of the following:

1. State and county taxes for the fiscal period of 2008 to 2009, lien now due and payable in the total amount of $921.69

   APN: 176-27-312-182

   First installment of $230.43 has been paid.

   Second installment of $230.42 has been paid.

   Third installment of $230.42 unpaid and due first Monday in January.

   Fourth installment of $230.42 unpaid and due first Monday in March.

2. Any supplemental taxes, which may become a lien on the subject property by reason of increased valuations due to land use or improvement, NRS 361-260, or otherwise.

3. The herein described property lies within the boundaries of the Clark County Sanitation District and is subject to any and all assessments and obligations thereof.

4. Water rights, claims or title to water, whether or not shown by the public records.

5. Reservations and Easements in the Patent from the United States of America, recorded 04/14/58, in Book 157 as Document No. 128762, of official records.

   The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

6. Reservations and Easements in the Patent from the United States of America, recorded 01/30/61, in Book 280 as Document No. 226519, of official records.

   The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

7. Reservations and Easements in the Patent from the United States of America, recorded 12/04/63, in Book 496 as Document No. 399637, of official records.

   The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

ALTA Loan Policy
Schedule B - I

**SCHEDULE B - PART I**
(Continued)

**Order Number:** 45002-08-11804
**Policy Number:** 45002-08-11804-02
**Loan Ref.:** 0008937153

8.  Reservations and Easements in the Patent from the United States of America, recorded 11/03/78, in Book 965 as Document No. 924220, of official records.

    The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

9.  Reservations and Easements in the Patent from the United States of America, recorded 08/22/79, in Book 1106 as Document No. 1065299, of official records.

    The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

10. Reservations and Easements in the Patent from the United States of America, recorded 10/11/01, in Book 20011011 as Document No. 1655, of official records.

    The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

11. Reservations and Easements in the Patent from the United States of America, recorded 08/14/03, in Book 20030814 as Document No. 268, of official records.

    The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

12. Reservations and Easements in the Patent from the United States of America, recorded 08/27/04, in Book 20040827 as Document No. 1812, of official records.

    The interest of Nevada Power Company in the reserved rights of way in said patent were partially relinquished by an instrument Recorded 09/13/2005 in Book 20050913, as Document No. 4560.

13. The effect of the matters disclosed by a Certificate of Land Division Number 198-79, recorded 10/01/80, in Book No. 1290, as Document No. 1249197.

14. Terms, Covenants, Conditions and Provisions in an instrument entitled "Development Agreement between County of Clark and Mountain's Edge, LLC for Mountain's Edge Master Plan Community" recorded 04/02/03 in Book 20030402 as Document No. 3352 of official records.

    Terms, Covenants, Conditions and Provisions in an instrument entitled "First Amendment to the Development Agreement between County of Clark and Mountain's Edge Master Planned Community" recorded 08/19/04 in Book 20040819 as Document No. 2302 of official records.

15. Terms, Covenants, Conditions and Provisions in an instrument entitled "Master Declaration of Covenants, Condtions and Restrictions and Reservations of Easements for Mountain's Edge (A Nevada;Master Planned Community) recorded 04/14/03 in Book 20030414 as Document No. 2089 of official records.

    The provisions of said Covenants, Conditions and Restrictions were extended to include the herein described land by a Declaration of Annexation recorded 12/02/04 in Book No. 20041202 as Document No. 660.

ALTA Loan Policy
Schedule B - I

SCHEDULE B - PART I
(Continued)

**Order Number:** 45002-08-11804
**Policy Number:** 45002-08-11804-02
**Loan Ref.:** 0008937153

16. An easement affecting the portion of said land and for the purpose stated therein, and incidental purposes.

    In favor of: County of Clark

    No representation is made as to the present ownership of said easement.

    For: Perpetual Avigation
    Recorded: 07/23/03
    Book No.: 20030723
    Document No.: 3205

17. An easement affecting the portion of said land and for the purpose stated therein, and incidental purposes.

    In favor of: County of Clark

    No representation is made as to the present ownership of said easement.

    For: Perpetual Avigation
    Recorded: 08/13/03
    Book No.: 20030813
    Document No.: 3749

18. An easement affecting the portion of said land and for the purpose stated therein, and incidental purposes.

    In favor of: County of Clark

    No representation is made as to the present ownership of said easement.

    For: Perpetual Avigation
    Recorded: 09/05/03
    Book No.: 20030905
    Document No.: 1825

19. Terms, Covenants, Conditions and Provisions in an instrument entitled "District Financing Agreement for Special Improvement District No. 142 (Mountain's Edge) recorded 10/15/03 in Book 20031015 as Document No. 2945 of official records.

ALTA Loan Policy
Schedule B - I

**SCHEDULE B - PART I**
(Continued)

Order Number: 45002-08-11804
Policy Number: 45002-08-11804-02
Loan Ref.: 0008937153

20. An easement affecting the portion of said land and for the purpose stated therein, and incidental purposes.

In favor of: Nevada Power Company

No representation is made as to the present ownership of said easement.

For: Electrical Lines
Recorded: 11/07/03
Book No.: 20031107
Document No.: 2040

21. An easement affecting the portion of said land and for the purpose stated herein, and incidental purposes

In favor of: County of Clark

no representation is made as to the present ownership of said easement.

For: public easement
Recorded: 02/27/04
Book No.: 20040227
Document No.: 718

22. Terms, Covenants, Conditions and Provisions in an instrument entitled "License Agreement" recorded 07/02/04 in Book 20040702 as Document No. 2936 of official records.

Said Covenants, Conditions and Restrictions were modified by an instrument recorded 07/14/05 in Book No. 20050714 as Document No. 5620.

23. Reservations and Easements in a Deed affecting the portion of said land and for the purpose stated herein, and incidental purposes

Recorded: 12/02/04
Book No.: 20041202
Document No.: 661

24. Terms, Covenants, Conditions and Provisions in an instrument entitled "Declaration of Development Covenant and Restrictions" recorded 12/02/04 in Book 20041202 as Document No. 662 of official records.

25. Terms, Covenants, Conditions and Provisions in an instrument entitled "Declaration of Development Covenants and Restrictions" recorded 12/02/04 in Book 20041202 as Document No. 663 of official records.

ALTA Loan Policy
Schedule B - I

**SCHEDULE B - PART I**
(Continued)

Order Number:   45002-08-11804
Policy Number:  45002-08-11804-02
Loan Ref.:      0008937153

26.  An easement affecting the portion of said land and for the purpose stated herein, and incidental purposes

In favor of: County of Clark

no representation is made as to the present ownership of said easement.

For: Drainage
Recorded: 12/02/04
Book No.: 20041202
Document No.: 3720

27.  An easement affecting the portion of said land and for the purpose stated therein, and incidental purposes.

In favor of: Las Vegas Valley Water District, a quasi-municipal corporation

No representation is made as to the present ownership of said easement.

For: Pipelines
Recorded: 12/15/04
Book No.: 20041215
Document No.: 653

28.  Terms, Covenants, Conditions and Provisions in an instrument entitled "Off-Site Improvements Agreement" recorded 01/03/05 in Book 20050103 as Document No. 3082 of official records.

29.  An easement affecting the portion of said land and for the purpose stated herein, and incidental purposes

In favor of: Clark County Water Reclamation District

no representation is made as to the present ownership of said easement.

For: Sewer Lines
Recorded: 01/06/05
Book No.: 20050106
Document No.: 1657

30.  Any easements not vacated by that certain order of vacation recorded 11/17/05 in Book 20051117 as Document No. 5853 of official records.

31.  An easement affecting the portion of said land and for the purpose stated herein, and incidental purposes

In favor of: County of Clark

no representation is made as to the present ownership of said easement.

For: Drainage
Recorded: 03/25/05
Book No.: 20050325
Document No.: 1763

ALTA Loan Policy
Schedule B - I

**SCHEDULE B - PART I**
(Continued)

Order Number: 45002-08-11804
Policy Number: 45002-08-11804-02
Loan Ref.: 0008937153

32. The effect of the following Record of Survey, filed in File 147 of Surveys, Page 96, recorded 04/22/05 in Book 20050422 as Document No. 1421 of official records.

33. Terms, Covenants, Conditions and Provisions in an instrument entitled "The Thirteenth Supplement to the Mountain's Edge Development Agreement" recorded 12/12/05 in Book 20051212 as Document No. 2535 of official records.

34. Terms, Covenants, Conditions and Provisions in an instrument entitled "Off-Site Improvements Agreement" recorded 01/12/06 in Book 20060112 as Document No. 313 of official records.

35. Any easements not vacated by that certain order of vacation recorded 02/27/06 in Book 20060227 as Document No. 4487 of official records.

    Said document was re-recorded 03/20/06 in Book 20060320 as Document No. 4987

36. An easement affecting the portion of said land and for the purpose stated therein, and incidental purposes.

    In favor of: Las Vegas Valley Water District, a quasi-municipal corporation

    No representation is made as to the present ownership of said easement.

    For: Pipelines
    Recorded: 03/06/06
    Book No.: 20060306
    Document No.: 772

37. Dedications and easements as shown on the recorded map referred to herein, on file in Book 131 of Plats, Page 17, of official records.

    The above map has been amended by a Certificate of Amendment recorded 05/19/08 in Book 20080519 as Document No. 3223 of official records.

38. Covenants, Conditions and Restrictions (but deleting therefrom any Covenant, Condition or Restriction indicating a preference, limitation, or discrimination, based on race, color, religion, sex, handicap, familial status, or national origin) as contained in the Declaration of Restrictions recorded 11/22/06 in Book 20061122 as Document No. 748.

    Said Covenants, Conditions and Restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

    The right to levy certain charges or assessments against said land which shall become a lien if not paid as set forth in the above described Declaration of Restrictions and is conferred upon Tuscalante Homeowners Association, Inc., a Nevada nonprofit corporation, including any unpaid delinquent assessment as provided therein.

    Said document was re-recorded 12/07/06 in Book 20061207 as Document No. 4149

    Said Covenants, Conditions and Restrictions were Amended and Restated by an instrument recorded 01/09/07 in Book No. 20070109 as Document No. 868.

ALTA Loan Policy
Schedule B - I

**SCHEDULE B - PART I**
(Continued)

**Order Number:** 45002-08-11804
**Policy Number:** 45002-08-11804-02
**Loan Ref.:** 0008937153

The provisions of said Covenants, Conditions and Restrictions were extended to include the herein described land by a Declaration of Annexation recorded 10/28/08 in Book No. 20081028 as Document No. 4299.

39. Terms, Covenants, Conditions and Provisions in an instrument entitled "Off-site Improvements Agreement" recorded 01/12/07 in Book 20070112 as Document No. 2985 of official records.

40. Terms, Covenants, Conditions and Provisions in an instrument entitled "Ordinance" recorded 02/06/07 in Book 20070206 as Document No. 2267 of official records.

41. Terms, Covenants, Conditions and Provisions in an instrument entitled "Development Agreement" recorded 02/06/07 in Book 20070206 as Document No. 2268 of official records.

    Said Covenants, Conditions and Restrictions were modified by an instrument recorded 09/04/07 in Book No. 20070904 as Document No. 856.

42. Terms, Covenants, Conditions and Provisions in an instrument entitled "Off-site Improvements Agreement" recorded 04/11/07 in Book 20070411 as Document No. 3876 of official records.

**(CONTINUED)**

ALTA Loan Policy
Schedule B - I

North American Title Insurance Company

**Order Number:** 45002-08-11804
**Policy Number:** 45002-08-11804-02
**Loan Ref.:** 0008937153

**SCHEDULE B-PART II**

**EXCEPTIONS FROM COVERAGE**

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, if any, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

NONE

**END OF SCHEDULE B**

ALTA Loan Policy
Schedule B - II

# NORTH AMERICAN TITLE GROUP FAMILY OF COMPANIES
## Privacy Policy Notice (2/1/08)

We at the North American Title Group family of companies take your privacy very seriously. This Notice is being given on behalf of each of the companies listed below [1] (the "North American Title Companies"), as well as on behalf of North American Advantage Insurance Services, LLC. It explains our policy regarding the personal information of our customers and our former customers.

**OUR PRIVACY POLICIES AND PRACTICES**

*The North American Title Companies*

1. **Information North American Title Companies collect, and the sources from which we collect it:**
   On forms related to your real estate transaction, North American Title Companies collect personal information that you, our affiliates or third parties have provided to us, such as, for example, your name, address, and sale price of your home. All of the information that we collect is referred to in this notice as "NAT Collected Information".

2. **What information North American Title Companies disclose to our affiliates:**
   From time to time, as permitted by law, the North American Title Companies may share NAT Collected Information with each other and with North American Advantage Insurance Services, LLC ("NAAIS") about customers and former customers. You may ask us not to share NAT Collected Information among the North American Title Companies and NAAIS by writing to us and letting us know at: North American Title Group, Inc., Attention: Corporate Affairs, 700 NW 107th Avenue, Suite 300, Miami, FL 33172. Your request will not affect NAT Collected Information that the North American Title Companies are otherwise permitted by law to share, such as, in certain circumstances, NAT Collected Information related to our experiences and transactions with you.

3. **What information North American Title Companies disclose to third parties:**

   - If permitted by federal law and the law of your state, we may disclose some or all of the following information to companies that perform marketing services on our behalf and to certain unaffiliated insurance companies with whom we have joint marketing agreements: your name, current address, purchased property address, and closing date.

   - We also may share NAT Collected Information about customers and former customers with other unaffiliated third parties, as permitted by law. For example, NAT Collected Information may be shared in certain circumstances (A) with companies involved in servicing or processing your account (B) with insurance regulatory authorities, and (C) with law enforcement officials, to protect against fraud or other crimes.

4. **Your right to access your personal information:**
   You have the right to review your personal information that we have on record about you. If you wish to review that information, please contact the local North American Title Company office identified on the title insurance product to which this notice is attached or where you received this notice and give us a reasonable time to make that information available to you. If you believe any information is incorrect, notify us, and if we agree, we will correct it. If we disagree, we will advise you in writing why we disagree.

S40NATTM.3978 Rev. 1/16/08

**_North American Advantage Insurance Services, LLC_**

1. **Information North American Advantage Insurance Services, LLC ("NAAIS") collect and sources from which we collect it:**
   NAAIS collects personal information about you from you, our affiliates, or third parties on forms related to your transaction with NAAIS or a North American Title Company, such as your name, address, or information about the property that is or will be insured. We also receive information from companies, which compile and distribute public records. All of the information that NAAIS collects, as described in this paragraph, is referred to in this notice as "NAAIS Collected Information."

2. **Information NAAIS may disclose to its affiliates or third parties:**
   NAAIS may disclose NAAIS Collected Information about you or others without your permission as permitted or required by law, including to the following types of institutions for the reasons described:

   - To a third party or an affiliate if the disclosure will enable that party to perform a business, professional or insurance function for us in connection with an insurance transaction involving you.

   - To an insurance institution, agent, or credit reporting agency in order to detect or prevent criminal activity, fraud or misrepresentation in connection with an insurance transaction.

   - To an insurance institution, agent, or credit reporting agency for either this agency or the entity to whom we disclose the information to perform a function in connection with an insurance transaction involving you.

   - To an insurance regulatory authority, law enforcement, or other governmental authority in order to protect our interests in preventing or prosecuting fraud, or if we believe that you have conducted illegal activities.

3. **Your right to access and amend your personal information:**
   You have the right to request access to the personal information that we record about you. Your right includes the right to know the source of the information and the identity of the persons, institutions or types of institutions to whom we have disclosed such information within two (2) years prior to your request. Your right includes the right to view such information and copy it in person, or request that a copy of it be sent to you by mail (for which we may charge you a reasonable fee to cover our costs). Your right also includes the right to request corrections, amendments or deletions of any information in our possession. The procedures that you must follow to request access to or an amendment of your information are as follows:

To obtain access to your information: You should submit a request in writing to: North American Title Group, Inc., Attention: Corporate Affairs, 700 NW 107th Avenue, Suite 300, Miami, FL 33172. The request should include your name, address, social security number, telephone number, and the recorded information to which you would like access. The request should state whether you would like access in person or a copy of the information sent to you by mail. Upon receipt of your request, we will contact you within 30 business days to arrange providing you with access in person or the copies that you have requested.

To correct, amend, or delete any of your information: You should submit a request in writing to: North American Title Group, Inc., Attention: Corporate Affairs, 700 NW 107th Avenue, Suite 300, Miami, FL 33172. The request should include your name, address, social security number, telephone number, the specific information in dispute, and the identity of the document or record that contains the disputed information. Upon receipt of your request, we will contact you within 30 business days to notify you either that we have made the correction, amendment or deletion, or that we refuse to do so and the reasons for the refusal, which you will have an opportunity to challenge.

********

**SECURITY PROCEDURES**

We restrict access to NAT Collected Information and NAAIS Collected Information about you to individuals who need to know such information in order to provide you with your product or service. We maintain physical, electronic and procedural safeguards to protect NAT Collected Information and NAAIS Collected Information about you.

********

**CHANGES TO OUR PRIVACY POLICY**

This Notice reflects our privacy policy as of February 1, 2008. We reserve the right to change, modify or amend this policy at any time. Please check our Privacy Policy periodically for changes.

---

[1] The North American Title Group Family of Companies are: North American Title Company, North American Title Insurance Company, North American Title Alliance, LLC, North American Title Florida Alliance, LLC, North American Services, LLC, North American Exchange Company, North American Title Agency, North American Abstract Agency and North American Legal Services, L.L.C.

********

**ACKNOWLEDGEMENT**

Your receipt of a copy of the preliminary report, commitment, your policy of insurance, or escrow documents accompanied by this Notice will constitute your acknowledgment of receipt of this Privacy Policy Notice.

S40NATTM.3978 Rev. 1/16/08

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

## CONDITIONS

### 1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b) or decreased by Section 10 of these Conditions.
(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.
(d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of
   (i) the amount of the principal disbursed as of Date of Policy;
   (ii) the amount of the principal disbursed subsequent to Date of Policy;
   (iii) the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;
   (iv) interest on the loan;
   (v) the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;
   (vi) the expenses of foreclosure and any other costs of enforcement;
   (vii) the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

(viii) the amounts to pay taxes and insurance; and
(ix) the reasonable amounts expended to prevent deterioration of improvements;
but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.
(e) "Insured": The Insured named in Schedule A.
   (i) The term "Insured" also includes
      (A) the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;
      (B) the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;
      (C) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
      (D) successors to an Insured by its conversion to another kind of Entity;
      (E) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
         (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
         (2) if the grantee wholly owns the named Insured, or
         (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;
      (F) any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;
   (ii) With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.
(f) "Insured Claimant": An Insured claiming loss or damage.
(g) "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.
(h) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
(i) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
(j) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
(k) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
(l) "Title": The estate or interest described in Schedule A.
(m) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

3.    **NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as Insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as Insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

4.    **PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

5.    **DEFENSE AND PROSECUTION OF ACTIONS**

(a)    Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)    The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)    Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

6.    **DUTY OF INSURED CLAIMANT TO COOPERATE**

(a)    In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)    The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage.

All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7.    **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a)    To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)    To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(ii)    To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)    To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)    to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii)    to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8.    **DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)    The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)    the Amount of Insurance,

(ii)    the Indebtedness,

(iii)    the difference between the value of the Title as Insured and the value of the Title subject to the risk insured against by this policy, or

(iv)    if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)    If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i)    the Amount of Insurance shall be increased by 10%, and

(ii)    the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c)    In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d)   In addition to the extent of liability under (a), (b), and (c), the Company will also pay these costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9.   LIMITATION OF LIABILITY**

(a)   If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)   In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c)   The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10.  REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a)   All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b)   The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**11.  PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**12.  RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a)   The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b)   The Insured's Rights and Limitations

(i)   The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii)   If the Insured exercises a right provided in (b)(i), but has knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c)   The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**13.  ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**14.  LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a)   This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)   Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c)   Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d)   Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**15.  SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**16.  CHOICE OF LAW; FORUM**

(a)   Choice of Law:  The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b)   Choice of Forum:  Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**17.  NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at 1855 Gateway Boulevard, Suite 600, Concord, California 94520, Attn: Claims Department.

If you have any questions regarding your policy you can contact us at:
Western States: 800-869-3434  Eastern States: 800-374-8475



## NORTH AMERICAN TITLE INSURANCE COMPANY

### *THANKS...*

We want to express our appreciation of your faith in North American Title Insurance Company.

This Policy is valuable and may entitle you to a lower premium on title insurance if you sell or refinance your property. We suggest you keep it in a safe place where it will be readily available.

There is no recurring premium for this policy.

If you have any questions about your settlement or closing, contact the office that issued your policy.

If you have any questions regarding your policy, you can write us at:

North American Title Insurance Company
1855 Gateway Boulevard, Suite 600
Concord, California 94520

or call us at:       Western States: 800-869-3434
Eastern States: 800-374-8475

SNATTP.4527 Rev. 06/28/07

